RICHARD G. CAMPBELL JR., ESQ.
Nevada Bar #1832
BRET F. MEICH, ESQ
Nevada Bar #11208
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone:  702.678.5070
Facsimile:  702.878.9995
rcampbell@armstrongteasdale.com
bmeich@armstrongteasdale.com

ROBERT R. KRACHT, ESQ.
Ohio Bar #0025574
CHARLES J. PAWLUKIEWICZ, ESQ.
Ohio Bar #0011499
MCARTHY LEBIT CRYSTAL & LIFFMAN CO, L.P.A.
101 W. Prospect Avenue, Suite 1800
Cleveland, Ohio 44115
Telephone: 216.696.1422
rrk@mccarthylebit.com
cjp@mccarthylebit.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs Keehan
Tennessee Investment, LLC, et al.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KEEHAN TENNESSEE INVESTMENT, LLC, et al., <br><br> Plaintiff, <br><br> vs. <br><br> GUARDIAN CAPITAL ADVISORS, INC., et al. <br><br> Defendant. | 3:14-cv-00500-RCJ-WGC <br><br> **OPPOSITION TO GUARDIAN CAPITAL ADVISORS, INC.'S AND KENNETH A. MILLER'S MOTION TO DISMISS AMENDED COMPLAINT** |

Plaintiffs Keehan Tennessee Investment, LLC, David Keehan, Donald J. Keehan, Sr., Durham Ridge Investments, LLC, Westlake Briar, LLC, Keehan Trust Funding, LLC, Donald J. Keehan, Jr., and 951 Realty Ltd. (collectively, "Keehan" or "Plaintiffs"), by and through their

1

counsel of record, hereby oppose Defendants Guardian Capital Advisors, Inc.'s and Kenneth A. Miller's (collectively, "Guardian" or "Defendants") Motion to Dismiss Amended Complaint (Doc. 64). This Opposition is made and based on the papers and pleadings on file herein, the following Memorandum of Points and Authorities, and any oral argument this Court may permit at the hearing of this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This case involves the failure of Defendants to fulfill their commitments to refinance a Golf Course Development near Nashville Tennessee (Stillwater Project). Guardian and the Plaintiffs entered into a binding Letter of Commitment whereby Guardian obligated itself to arrange for funding to refinance the project so that Keehan could avoid an imminent foreclosure from the existing lender for the Project. Guardian failed to fulfill its obligations under the terms of the Loan Commitment to fund the loan in a timely fashion and misrepresented its ability to even fund the loan in time to avoid the foreclosure on the Project. Guardian has made the instant motion to dismiss alleging that the complaint is not specific in its allegations regarding the fraud claim and that the breach of contract claim cannot stand because the Loan Commitment excused Guardian's performance if the loan did not close by April 15, 2014. The allegations set forth in the Amended Complaint clearly state plausible claims for relief, and, as to Guardian's fraudulent statements, the allegations state the who, what, when, where, and how of the misconduct. Therefore, this Court should deny Guardian's Motion to Dismiss.

### BACKGROUND

In the aftermath of the financial collapse of 2008, Stillwater's original lender ceased funding the development, bringing the Stillwater Project to a halt. As a result, Keehan arranged for a new lender in order to complete construction of the development. After a short period that lender, TN Fore, and a minority owner in the project, Scheel, sought to oust Keehan from the project and threatened foreclosure, which forced Keehan to seek another source of financing. Kenneth Miller, the principal of Guardian saw the opportunity to take advantage of the urgent need to obtain alternative financing for the project and solicited Keehan to act as an advisor and ultimately a broker

for new financing for the project, albeit without ever having any commitment for funding from a lender.

Guardian was part of the network of private investors and real estate lenders offering to finance the development. The network included Defendants Miller, Guardian, Praetorium Secured Loan Fund I, LP ("Praetorium"), George V. Cresson ("Cresson"), and Cresson d/b/a Development Finance, L.P. ("Development").

Guardian originally reached out to Plaintiff David Keehan and Plaintiff Donald J. Keehan, Jr. on April 23, 2013 with a request to play the Stillwater Golf Course so Guardian, through its principal Kenneth Miller, could get a "feel for the layout of the lots." (Affidavit of David Keehan ("Keehan Aff."), ¶2) (David Keehan's Affidavit is attached hereto as Exhibit "A"). Guardian made additional requests to David Keehan on May 7, 2013 and May 8, 2013. (Id.).

On December 16, 2013, Guardian again reached out to David Keehan, only this time Guardian wanted to act as an advisor and broker to evaluate an application for financing and to either arrange a lender for the Take Out Loan or make the loan itself. (Id., ¶4, Exhibit 1 thereto). Guardian's fee for the evaluation was Thirty-Two Thousand Dollars ($32,000.00). (Id. and Exhibit 1 thereto, p. 4). Guardian assured Keehan it could arrange for the take out financing by the end of January 2014, which was the date the TN Fore was threatening to initiate a foreclosure on the Stillwater project. That promise went unfulfilled. Instead, in February of 2014 Guardian worked primarily on a bridge loan so that Keehan could have funds to pay the hundreds of thousands of dollars that TN Fore was demanding for extensions for the foreclosure and have funds to pay the cost associated with the larger Take Out Loan. Guardian made repeated representations that the Bridge Loan and the Take Out Loan were inextricably intertwined and that fees and costs of the Bridge loan could be recouped from the larger Take Out Loan.

From December 2013 until late April 2014, Guardian initiated hundreds of contacts with David Keehan and the other Plaintiffs. Most of the contacts were by telephone, though at least two hundred (200) were by electronic mail. (Id., ¶5, Exhibit 2 thereto). Throughout the course of these communications Guardian continually assured Keehan and or their counsel that it could arrange take out financing to avoid a foreclosure.

3

Ultimately, there were three (3) loans that would be brokered by Guardian (1) A $24.5 Million "Take Out Loan" that was to be funded by either Guardian, Davidson Kempner Capital Management LLC (DKCM) or Reno Center Build-Out (presumably a Cresson entity), which would be used to buy out existing lenders and equity interest holders; (2) A $3.5 Million "Construction Loan" that was to be provided by Cresson and Development, which was to be used to finish construction; and (3) A $2.95 Million "Bridge Loan" that was to be provided by Cresson and Development and used to pay TN Fore the exorbitant extension fees that it was demanding and to assist in funding the legal fees and costs related to the Take Out Loan, and to pay off certain loans related to collateral that Cresson was demanding as security for the loan.

Finally, after months of promises and exchanges of information on March 4, 2014, Guardian and Keehan, with Cresson's Praetorium as the lender, entered into the Bridge Loan (Amended Complaint Exhibit C) and loan term sheets and loan commitments for both the $24.5 million Take Out Loan, (Amended Complaint, Exhibit A-2) and the $3.5 million construction loan. (Amended Complaint Exhibit A-3). According to the terms of the Take out Loan Commitment and statements by Guardian, Guardian represented that funds were then available and that the loan was a firm deal. Moreover, the commitment letter contained a break-up fee provision and if Keehan sought and obtained financing from a lender other than Guardian, Keehan was responsible for a $690,000.000 buyout fee.

Due to the demands being made by TN Fore regarding the commencement of foreclosure and the sale of the Stillwater Project, and the promises from Guardian that the take out financing was imminent, Keehan negotiated several short forbearance periods, which cost Keehan close to $500,000.00 in order to provide Guardian with additional time to finalize it obtaining the funds relative to the financing represented in the Loan Commitment. Guardian was to pay the extension charge, but Guardian did not perform.

On or about February 7, 2014, the principals of TN Fore, Guardian, and Keehan had a telephone conversation during which Guardian assured the parties that it could provide a short-term extension fee of $1.2 million to support an extension of the original lender's deadline.

///

4

Fully aware of the disastrous results that would occur if Keehan was unable to obtain forbearance from the original lender, Guardian and the other Defendants demanded substantial fees and guarantees, an interest rate of 15%, and imposed onerous collateral requirements for the Bridge Loan including an agreement under Ohio law that the loan could be foreclosed on and a default judgment entered without notice to lenders or a right to defend.  The substantial fees charged by Defendants for providing the Bridge Loan, and the payoff of certain mortgages on the commercial properties pledged as collateral to secure repayment of the Bridge Loan, increased the principal amount of the Bridge Loan to $2,995,000.00.  (Amended Complaint, Exhibit C).  Out of the proceeds of the Bridge Loan, Guardian was paid $138,000.00 and Praetorium received a $528,000.00 lender fee, and a $190,000.00 origination fee went to either of both Guardian and Praetorium.  (See Exhibit B, Declaration of Andrew Perry and Tab #1 attached thereto).

TN Fore had given extensions to Keehan until March 31, 2014 and despite promises from Guardian that the loan was going to be funded, TN Fore noticed a foreclosure on the Stillwater Project on April 2, 2014, with a foreclosure sale on April 24, 2014.  (Amended Complaint Exhibit B).

With actual knowledge of the pending foreclosure sale, Guardian continued to represent to Keehan that it would be able to close the Take Out Loan in sufficient time to pay off the original lender and stop the sale.  The loan documents relating to the Take Out Loan and Construction Loan were drafted and fully negotiated by and between Keehan and the Defendants on or about April 15, 2014.  Guardian sent e-mail correspondence to Keehan on April 10, 2014, stating that the relevant loan documentation was "largely complete" and that the loan would close "next week."  And on April 18, 2013, after threats from the original lender regarding foreclosure, Guardian, while acknowledging the loans would not fund on April 21st, stated that the "Transaction should get done next week," but that Keehan's counsel needed to postpone the foreclosure sale.  (See Exhibit B, Declaration of Andrew Perry and Tab #2 attached thereto).

On the following Monday, April 21, 2014, counsel for DKCM, the lender identified by Guardian as prepared to immediately fund the Loan Commitment, sent a letter to Keehan's counsel via e-mail in which he notified Keehan for the first time since the Loan Commitment was issued that "…Davidson Kempner Capital Management, LP ("DKCM")…never agreed to participate in the loan

by a particular date.  Further, Guardian is not an agent of, and is not affiliated with, DKCM."  A copy of the transmittal e-mail and April 21, 2014 letter are attached to the Amended Complaint as Exhibit E.

As a result of the April 21, 2014 correspondence disavowing DKCM's obligation to close the Take Out Loan, it was evident that Guardian misrepresented its ability to fund the loan and would not perform under the Loan Commitment in time to save the Stillwater Project from the foreclosure sale.  Incredibly, on April 25, 2014 Miller was still representing that he was working on the loan and that there was "a limited window" to complete the transaction.  See Exhibit B, Declaration of Andrew Perry and Tab #3 attached thereto.  At no time did Guardian ever disavow its obligation to fund the loan either by the passage of time or due to Keehan not meeting the conditions required of them in the Commitment letter.

Keehan took immediate steps in order to mitigate the loss of the development, resulting in a $17,502,500.00 Take Out Loan from an alternative source that paid off TN Fore which closed on April 23, 2014.  As a material condition of obtaining the Alternative Take Out Loan, however, Keehan was required to accept the terms and conditions required by the alternative financing source and was forced to sell a majority interest in the Stillwater Project resulting in a loss of over $20 million.

Keehan initiated the instant action in Ohio state court.  The case was removed, and District Judge Nugent from the Northern District of Ohio transferred the case to the District of Nevada (Doc. 35).  Because Judge Nugent transferred the case without disposing of the substantive elements of Guardian's Motion to Dismiss, this Court is charged with disposing of the Defendants' remaining arguments, which have now been reframed and restated in a renewed Motion to Dismiss (Doc. 65).

**MOTION TO DISMISS STANDARD**

Guardian has moved under FRCP 12(b)(6) and FRCP 9(b).  A Rule 12(b)(6) motion tests whether a legally sufficient claim has been pleaded.  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible" on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged

6

1 misconduct. *Ashcroft*, 556 U.S. at 678.  When assessing whether a plaintiff has set forth a "plausible"
2 claim, a district court must accept all of the complaint's factual allegations as true. *Ziegler v. IBP*
3 *Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  In ruling on a motion to dismiss, the court may
4 consider the complaint, as well as (1) documents that are referenced in the complaint or that are
5 central to plaintiff's claims, (2) matters of which a court may take judicial notice, and (3) documents
6 that are a matter of public record. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322
7 (2007).

8 FRCP 9(b) requires that in alleging fraud, a pleading must identify the "who, what, when,
9 where, and how of the misconduct charged," as well as "what is false or misleading about [the
10 fraudulent] statement, and why it is false." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993,
11 998 (9th Cir. 2010) (internal quotation marks and citations omitted).

## ARGUMENT

Keehan has properly pleaded its causes of action against Defendants.  Keehan has alleged, with extensive supporting documentation, that Guardian breached its contractual obligation under the Loan Commitment to fund the Take Out Loan in the timeframe required under the Agreement between the parties.  Keehan has further specifically alleged that Guardian misrepresented that it had the funding to complete the loan.  For the reasons that follow, this Court should deny Guardian's Motion to Dismiss.

**The Fraud Claim Is Properly Pleaded.**

Keehan's allegations are facially plausible and specific.  The allegations are distinct from Keehan's breach of contract claim, and identify the who, what, when, where, and how of Guardian's fraud.

Guardian's argument is calculated to make it appear as if Keehan's breach of contract claim is also pleaded as a fraud claim.  Guardian misses the mark entirely.  Separate and apart from Guardian's contractual obligations under the Commitment Term Sheet to fund the loan, Guardian made specific representations that it had the **ability** from the beginning to fund the $24.5 Million Take Out Loan. The statements made by Guardian are described throughout the Amended Complaint, and the misrepresentations are embodied in the terms of the Take Out Loan.

7

According to Guardian, it was prepared to fund the $24.5 Million Take Out Loan and the $3.5 Million Construction Loan. (Amended Complaint, ¶¶24, 56). The Take Out Loan Commitment Term Sheet, included as a part of the Take Out Loan Commitment Letter signed by Miller and Guardian on March 3, 2014 and attached as Exhibit "A-2" to the Amended Complaint, unambiguously says that the $24.5 Million Take Out Loan will be made to Keehan by Guardian and/or by Reno Center Build Out, LLC, or Davidson Kempner Capital Management LLC. The Take Out Loan was to be made by April 15, 2014.

To further give the impression that funds were then available and it was a firm deal, the Take Out Loan Commitment states that Guardian "agrees to make the loan to borrower, subject to the terms of this Commitment and subject to Borrowers satisfying all conditions set forth below". Thus, the who, what, when, where, and how of the false statements are sufficiently described. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

The other necessary allegations of fraud, that is, reasonable reliance, falsity of the statements and damages, are also sufficiently set forth in the Amended Complaint. Paragraphs 57 and 58 allege that Keehan relied on Guardian's statements by entering into the Agreements and paying all of the fees charged. Moreover, by the terms of the Commitment, Keehan would have been obligated to pay a breakup fee of $690,000.00 in the event that Keehan sought and obtained financing from a source other than Guardian. (Amended Complaint, Exhibit A-2, p. 2, ¶4.)

Paragraph 59 further alleges that Guardian knew that its statements that sufficient funds were then available were false when made. The falsity of the statements made Guardian is demonstrated by Exhibit "E" to the Amended Complaint, whereby the lender identified by Guardian disavowed ever representing that it made a commitment to fund the loan, which shows that, at the time the statements were made by Guardian on March 3, 2014, the funds were not available.

Therefore, the Amended Complaint clearly provides Guardian with notice of the particulars of the fraud claim against it. The allegations in the Amended Complaint, as enhanced by the Exhibits attached thereto, satisfy the requirements of FRCP 9(b) and FRCP 12(b)(6). Consequently, the Motion to Dismiss the fraud count must be denied.

/ / /

**Plaintiffs Assert a Valid Breach of Contract Claim that is Not Barred by the Statute of Frauds.**

Guardian contractually obligated itself to fund the Take Out Loan in sufficient time to pay off the existing lender and stop the pending foreclosure sale. (Amended Complaint, ¶39). It breached that promise. As a result, Keehan was forced to obtain alternate funding at unfavorable terms. Guardian argues that Keehan's breach of contract claim should be dismissed because the written signed loan commitments expired by their own terms on April 15, 2014, and there can have been no liability imposed upon them after that date.

In the instant case, the Amended Complaint comprehensively describes Guardian's breach of the Loan Commitment. Count One alleges that Guardian "breached the terms of the Commitment[] by failing to close the Take Out…by April 15, 2014 and/or prior to the foreclosure sale on April 24, 2014 as agreed". (Amended Complaint, ¶50).

The terms of the Loan Commitment state that Guardian "agrees to make the Loan to Borrower, subject to the terms of this Commitment and subject to Borrower's satisfying all conditions as set forth below and as may reasonably be required by Lender". (Amended Complaint, Exhibit A-2, ¶2). Despite Keehan's full, timely compliance with its obligations under the terms of the Loan Commitment, Guardian failed to fund the loan by the contractual deadline—April 15, 2014. (Amended Complaint, ¶37). Guardian stretches the bounds of credulity by arguing that the contract term providing for the expiration of the agreement means that if Guardian decided not to fund the loan, it had no obligations under the Loan Commitment. The Loan Commitment, however, provided for five separate "termination events"—only on the occurrence of one of these events would Guardian be entitled to break its agreement to fund the Take Out Loan. The expiration clause is meant to provide for the Loan Commitment's termination if Keehan failed to meet the closing conditions. (Amended Complaint, Exhibit A-2, ¶3) ("If the closing conditions have not been satisfied and the Loan funded…the parties' obligations under this Commitment to close the Loan shall cease"). Because Keehan met its obligations under the Loan Commitment and because Guardian did not fund the loan by April 15, 2014, Guardian breached its contract with Keehan.

Nevertheless, despite its breach of the Loan Commitment, Guardian continued to represent to Keehan that it would close the Take Out Loan in sufficient time to pay off the original lender and

1  stop the pending foreclosure sale scheduled for April 24, 2014. (Amended Complaint, ¶39). As a
2  result of Guardian's representations, Keehan continued to operate under the terms of the Loan
3  Commitment, except for the original contract's closing date, believing that the Take Out Loan was
4  going to fund. Therefore, after Guardian's breach of the Loan Commitment, the parties, both orally,
5  in e-mail correspondence, and by conduct, agreed to extend the April 15, 2014 deadline in the Take
6  Out Loan Commitment Agreement. See Exhibit B, Declaration of Andrew Perry and Tab #4
7  attached thereto.

8  Under Ohio law, the terms of a contract may be waived or changed by conduct. *SDR & R,*
9  *Inc. v. JMS Constr. Co.*, 8th Dist. Case No. 57975, 1991 Ohio App. LEXIS 360 (8th Dist.), **6, 7
10 (holding that parol evidence rule did not preclude evidence of conduct after the signing of the written
11 agreement); *Pepsico, Inc. v. Cent. Inv. Corp.*, 271 F. Supp. 2d 1040, 1052 (S.D. Ohio W.D. 2001)
12 (parol evidence rule has no application to a subsequent agreement or subsequent oral modification of
13 a written agreement). The "general rule is that a written contract may be orally amended if the oral
14 amendment has the essential elements of a binding contract." *Fraher Transit, Inc. v. Aldi, Inc.*, 9th
15 Dist. Case No. 24133, 2009 Ohio App. 336, *12 (internal quotation omitted). Because of the parties'
16 conduct, Guardian made an offer to fund, Keehan accepted that offer, and Keehan agreed to abide by
17 the terms set forth in the Commitment Letter.

18 As to Keehan's allegation that Guardian breached its agreement to fund the Take Out Loan
19 before April 24, 2014 (following Guardian's original breach of contract, and after the parties agreed
20 to modify or novate the Loan Commitment), Guardian alleges that, even if it did verbally agree to
21 fund the loan by a later date, it was not bound by its verbal agreement because of the requirement of
22 the Statute of Frauds and the terms of the Loan Commitment that it do so in a signed document
23 ("This Commitment may not be amended or modified except in a writing executed by both parties").
24 However, by Guardian's conduct in assuring Keehan that it would fund the loan before the scheduled
25 foreclosure, Guardian is waived its right to enforce that contractual provision. More importantly,
26 Guardian had already breached its agreement to fund the loan by April 15, 2014, and Keehan was
27 merely being reasonable, given Guardian's continued assurances. In addition, Guardian confirmed in
28 writing that the loan funding date would move beyond the original April 15th date. (Amended

Complaint Para. 41) In a series of emails between Miller and counsel for Keehan, Miller discussed funding the loan after April 15th, 2014. See Exhibit B, Declaration of Andrew Perry and Tabs #3-5 attached thereto.

As to the Statute of Frauds, R.C. §1335.02 only provides protection for financial institutions. In relevant part, R.C. §1335.02(B) states:

> No party to a loan agreement may bring an action on a loan agreement unless the agreement is in writing and signed by the party against whom the action is sought or by the authorized representative of the party against whom the action is sought.

As used in the statute,

> "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, mortgages, or other documents or commitments, or any combination of these documents or commitments, ***pursuant to which a financial institution*** loans or delays, or agrees to loan or delay, repayment of money, goods, or anything of value, or otherwise extends credit or makes financial accommodation. [Emphasis added].

O.R.C. §1335.02(A)(3).

A "financial institution" entitled to the requirements and protections of the Statute of Frauds is:

> (a) A federally or state-chartered bank, savings bank, savings and loan association, or credit union, or a holding company, subsidiary, or affiliate of a bank, savings bank, or savings and loan institution
>
> (b) A licensee under §§1321.01 to 1321.19 of the Revised Code, or a registrant under §§1321.51 to 1321.60 of the Revised Code, or a parent company, subsidiary, or affiliate of a licensee or registrant.

O.R.C. §1335.02(A)(2).

Guardian is not a "financial institution". To the contrary, according to public records, Guardian is licensed as a real estate broker in California. Construing the Amended Complaint in favor of Keehan, accepting the factual allegations contained as true and drawing all reasonable inferences in Plaintiffs' favor, Keehan's breach of contract claim is not barred in all or any part by the Statute of Frauds. This argument, however, relates only to one part of Keehan's Count One—the

11

breach of the novation or modified Loan Commitment. Even if Keehan's agreement with Guardian to extend the closing date is not enforceable, Keehan's breach of contract claim as to Guardian's failure to fund by April 15, 2014, survives.

## CONCLUSION

For the reasons stated above, the Amended Complaint contains sufficient factual allegations to state plausible claims for relief. Keehan's claim alleging fraud identifies with specificity the who, what, when, where, and how of Guardian's misconduct, and Keehan's breach of contract claim sets forth plausible allegations that provide bases for relief.

Dated this 12th day of December, 2014

ARMSTRONG TEASDALE LLP

By: */s/Richard G. Campbell Jr.*
Richard G. Campbell Jr., Esq.
Bret F. Meich, Esq.
3770 Howard Hughes Pkwy., Ste. 200
Las Vegas, Nevada 89169
Telephone: 702.678.5070
Facsimile: 702.878.9995

*Attorneys for Plaintiffs Keehan Tennessee Investment, LLC, et al.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been filed electronically on this 12th day of December, 2014.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties not receiving service through the Court's electronic filing system will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

                                      */s/ Jessica Elia*
                              An employee of ARMSTRONG TEASDALE LLP